UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| MASON ROBERT JAMES HICKS, | |
| Plaintiff, | Case No. 3:21-cv-00837 |
| v. | Judge Aleta A. Trauger |
| | Magistrate Judge Alistair E. Newbern |
| CITY OF MILLERSVILLE et al., | |
| Defendants. | |

To:    The Honorable Aleta A. Trauger, District Judge

## REPORT AND RECOMMENDATION

This action brought under 42 U.S.C. § 1983 and Tennessee law arises out of pro se Plaintiff Mason Robert James Hicks's arrest and prosecution in Summer County, Tennessee, on charges of mailbox tampering that were ultimately dismissed. (Doc. No. 1.)

Hicks initially asserted claims of false arrest and malicious prosecution under § 1983 and Tennessee law against former Millersville Police Department Officers Melissa Pearce and Blake Riley (collectively, the Officers) and Millersville Assistant Police Chief Dustin Carr and claims under § 1983 and the Tennessee Governmental Tort Liability Act (TGTLA) against the City of Millersville.[1] (Id.)

The City and the Officers have now filed motions for summary judgment under Federal Rule of Civil Procedure 56 (Doc. Nos. 84, 88.) Hicks has responded in opposition to their motions (Doc. Nos. 100, 101), and the City and the Officers have replied (Doc. Nos. 103, 104). The Court

---

[1]    The complaint also names the State of Tennessee and Judge Dee David Gay as defendants but does not identify what claims Hicks asserts against them. The Court dismissed Gay and the State from the action on their motion to dismiss. (Doc. Nos. 53, 55.)

referred this action to the Magistrate Judge to dispose or recommend disposition of any pretrial motions under 28 U.S.C. § 636(b)(1)(A) and (B). (Doc. No. 5.) Considering the record evidence and the parties' arguments, and for the reasons that follow, the Magistrate Judge will recommend that the Court grant summary judgment to these defendants.

## I.  Background

### A.  Factual Background[2]

#### 1.  March 18, 2019 Arrest

In 2019, Hicks had been living at 1000 Heather Drive in Goodlettsville, Tennessee, for "roughly 16 [or] 15 years" with "[his] mom, dad, brother[,] and sister." (Doc. No. 86-1, PageID# 493.) On March 18, 2019, at approximately 12:11 p.m., Summer County Police Department dispatch received a 911 call that Allison Absher, who lived at 998 Heather Drive, had seen a suspicious "male walking up and down the road trying to get into cars" and "going through [residents'] mailboxes . . . ." (Doc. No. 90-1, PageID# 698; Doc. Nos. 85, 100.) Pearce responded to the 911 call and was the first officer to arrive on Heather Drive. (Doc. Nos. 90, 90-2.) Pearce parked her car in front of Absher's residence and began to observe the area. (Doc. Nos. 85, 100.)

---

[2]     The facts in this section are drawn from Hicks's complaint (Doc. No. 1), Hicks's response in opposition to the Officers' motion to dismiss (Doc. No. 39), the City and the Officers' statements of undisputed material facts (Doc. Nos. 85, 93) Hicks's responses (Doc. Nos. 100, 101), the City's exhibits (Doc. Nos. 86-1-4), the Officers and non-party Shawn Stine's declarations (Doc. Nos. 90, 91, 92) and other exhibits (Doc. Nos. 89-1, 90-1-4, 92-1-5).

The Officers have filed an audio recording of the police radio traffic on the day of Hicks's arrest (Doc. Nos. 94, 97). That recording "[captures] the radio traffic that takes place by and among police officers and dispatch" in which the officers use their unit numbers to identify themselves. (Doc. No. 92, PageID# 720, ¶ 5.) The Officers filed a summary of the recording. (Doc. No. 90-2, PageID# 705.) The summary is not a verbatim transcript of the recording, but the discrepancies are not sufficiently material to prevent the Court from referring to the summary in this Report and Recommendation. Hicks does not contest the accuracy of the summary and does not argue that the Court should not rely on it. (Doc. Nos. 100, 101.)

A few minutes later, Pearce called Emmanuel Manoloules, a White House, Tennessee, police officer with whom Pearce had previously worked and who she knew lived at 1005 Heather Drive; Pearce gave Manoloules "a description of all vehicles" as "[she] drove through the neighborhood." (Doc. No. 86-3, PageID# 603; Doc. No. 92-3.) Manoloules told Pearce that "[a]ll the vehicles . . . that [she] described to him . . . did belong in the neighborhood." (Doc. No. 86-3, PageID# 603; Doc. No. 90.)

Riley and Carr also responded to the 911 call. Carr instructed Riley to "stay out of the neighborhood where the [i]ncident occurred while [Carr] and . . . Pearce went to Heather Drive to look for a suspect." (Doc. No. 90, PageID# 691, ¶ 5; Doc. No. 92.) Pearce and Carr saw a black Mercedes travel down Heather Drive and leave the subdivision, which they considered suspicious. (Doc. Nos. 90-2, 92-4.) Neither Pearce nor Carr was able to get the license plate number of the Mercedes to do a registration check. Riley, however, spotted the car outside the subdivision and ran the license plate number, which identified the Mercedes as registered to Shawn Stine. (Doc. No. 90-2, PageID# 705; Doc. No. 90.) Manoloules informed Pearce that the Mercedes "did not belong in the neighborhood." (Doc. No. 90-2, PageID# 705; Doc. No. 92, PageID# 720–21, ¶ 9.)

Carr instructed Riley to stop the Mercedes and Pearce to get a description of the mailbox-tampering suspect from Absher. (Doc. No. 90-2.) Absher told Pearce that the suspect "was wearing a light gray hoodie that covered his face, was approximately 5-11, slim build, [and] . . . on foot." (Doc. No. 90-2, PageID# 705; Doc. No. 92.) Stine, who was driving the Mercedes, told Riley that he was in the neighborhood to conduct a real-estate appraisal. Stine later stated that he "do[es] not remember what [he] was wearing that day"; he "do[es] not believe that [he] would have been wearing a hoodie" but "might have been wearing a hat." (Doc. No. 91, PageID# 716, ¶¶ 6–7.) Riley ruled out Stine as suspect and let him leave. (Doc. No. 90.)

3

Carr, Pearce, and Riley then "converged on Heather Drive and were talking in front of" Manoloules's residence. (Doc. No. 92, PageID# 721, ¶ 12.) Pearce saw Hicks emerge from a house across the street and "pac[e] back and forth in front of his residence and in the street . . . ." (Doc. No. 92, PageID# 721, ¶ 12.) Hicks took photographs and video of the officers, and Pearce took four photographs of Hicks. (*Id.*; Doc. No. 90.) Hicks "was wearing a light gray hoodie." (Doc. No. 92, PageID# 721, ¶ 12.)

Because Hicks's hoodie matched the description that Absher had given Pearce of the suspected mailbox tamperer, Pearce walked back to Absher's residence "to see if [Hicks] could possibly be the person [ ] Absher had seen." (Doc. No. 92, PageID# 721, ¶ 13.) Pearce showed Absher the photographs of Hicks she had just taken, and "Absher said she believed the person depicted in [them] . . . was the same person she had seen tampering with the mailboxes, but she was not certain based on [these] photographs . . . ." (Doc. No. 92, PageID# 721, ¶ 13.) Pearce relayed to the other officers that Absher "believe[d] that may be the individual." (Doc. No. 90-2, PageID# 706.) Absher also identified three houses where she thought the suspect had opened the mailbox, including Manoloules's house. (Doc. No. 92.)

Pearce rejoined the other officers in front of Manouloules's house, where Hicks was "still pacing back and forth" across the street. (Doc. No. 92, PageID# 722, ¶ 15.) As Absher left for work, she drove up to the officers and saw Hicks "sitting on the curb[,]" wearing "[a] gray hoodie and black pants." (Doc. No. 92-4, PageID# 738.) Absher stated that it was the "same gray hoodie and black pants that [she] had seen the person wearing earlier[.]" (*Id.*) Pearce and Riley state that Absher was "100% certain" that Hicks was the person she had seen tampering with the mailboxes. (Doc. Nos. 93, 101.) Pearce then spoke to Manoloules and the other mailbox owners, and all stated they wanted to press charges against the tamperer. (Doc. No. 90, PageID# 692, ¶ 13.)

Hicks states that, while he was standing outside his house watching the officers, he saw his neighbor also standing outside and decided to "go talk to her and have her clear [his] name [because] she would [have known] [that] [Hicks]" was not involved in the mailbox tampering. (Doc. No. 86-1, PageID# 503.) Hicks states that, before he could do so, "[Pearce] told [him] to freeze[,] so [he] stood still and then she told [him] he was under arrest." (*Id.*) Pearce states that she "called out for [Hicks]" to come talk to her, but Hicks responded that he wouldn't talk to her without an attorney present. Pearce states that she then walked towards Hicks and "placed him under arrest for fear that he might commit some other crime." (Doc. No. 92-4, PageID# 741.) Hicks was placed in Riley's vehicle and transported to the Millersville Police Department. (Doc. Nos. 90, 92.)

At the police station, Riley prepared an affidavit of complaint under Carr's supervision. (Doc. Nos. 90, 92.) Riley's affidavit states:

> On Monday the 18th day of March, 2019, Officer were dispatched to the area of Heather Drive for a suspicious person walking down the road opening mailboxes. When officers arrived[,] they spoke with several witnesses and w[ere] given a good description of a suspect. Officers noticed a white male matching the description of the male that was tampering with mailboxes coming out of 1000 Heather Drive. Witnesses were able to identify the suspect, Mason Hicks. I, Officer Riley put Mr. Hicks in custody for Tampering with mailboxes. [Signed] BR."

(Doc. No. 90-3.) Riley states that he then took Hicks to the Sumner County Jail, where the commissioner told him to handwrite the following language at the end of his statement: "due to the fact that there is a reasonable likelihood that the offense would continue or that property would be endangered." (Doc. No. 90, PageID# 693, ¶ 16.) Riley states that "[he is] not sure why [he] used the plural" to state that more than one witness identified Hicks but that he may have "had the impression" that other residents of Heather Drive who pressed charges "saw the [i]ncident." (Doc. No. 90, PageID# 693, ¶15.) Pearce states that Riley "may not have known that neither resident had

5

seen the mailbox tampering take place." (Doc. No. 92, PageID# 722–23, ¶ 18.) Riley and Pearce completed supplemental reports memorializing the day's events. (Doc. Nos. 90-4, 92-3.)

Hicks was charged with mailbox tampering and held on a $500.00 bond, which Hicks's father paid in cash on the day of his arrest.

### 2. Summer County Criminal Prosecution

A preliminary hearing was held in Sumner County General Sessions Court on July 15, 2019. (Doc. No. 86-3.) Hicks appeared at the hearing represented by counsel. (Doc. No. 86-3.) The prosecution called Absher and Pearce as witnesses. (*Id.*) Riley states that he spoke with "a Deputy District Attorney General about [his] lack of direct knowledge about what witnesses had stated, so the decision was made to not call [him] as a witness at the preliminary hearing . . . or at the presentment to a grand jury." (Doc. No. 90, PageID# 693, ¶ 17.)

Absher testified on direct examination that, on the morning of March 18, she went outside her house and "saw a man standing there in a gray hoodie and black pants." (Doc. No. 86-3.) The man was "opening the mailbox and they opened a car door, a tan car . . . in front of the house with the mailbox that he opened." (*Id.*) The man did not take anything from the car or mailbox, but "went across the street and looked in the mailbox across the street." (*Id.*) Absher called her brother and told him what she had seen; her brother called the police. (*Id.*) Pearce then arrived at Absher's house, and Absher "told her what [she] had s[een] and gave them a description" of the tamperer. (*Id.*) When Absher left for work, she "drove over to where Officer [Pearce] was and asked her if she needed anything else from me" and saw Hicks "sitting on the curb" wearing "[a] gray hoodie and black pants." (*Id.*) Absher stated that it was "the same gray hoodie and black pants that [she] had seen the person wearing earlier." (*Id.*) On cross-examination, Absher testified that she identified Hicks as the suspect because "[h]e was wearing the exact same thing." (*Id.*) Absher also

testified that Pearce showed her a picture of Hicks and that she was able to say "that the guy sitting on the curb and the guy in the picture . . . [were] the same guy[.]" (*Id.*)

Pearce testified on direct examination about arriving in the area after the 911 call and the stop of the Mercedes. (*Id.*) She testified that, when Hicks came out of his house that morning, "based on his clothing description, we suspected that he might be the one that hade been possibly tampering with mailboxes." (*Id.*) Pearce testified that the officers did not immediately talk to Hicks and that Hicks "was outside pacing around, taking pictures, taking videos of us . . . ." (*Id.*) Pearce and the other officers "were standing in front of Officer Manouloules's house and [Manouloules's] residence was one of the ones that Ms. Absher indicated the suspect had opened along with the house at 1003 and 1001." (*Id.*) When Absher drove up to the officers, Pearce asked her "if the gentleman walking around outside — and I showed her a picture as I asked her of [Hicks], if that was who she saw, and she replied, yes, I am 100 percent certain that is him." (*Id.*) Pearce testified that she called out to Hicks to come talk to her and he replied he would not without an attorney. (*Id.*) Pearce said, "that's fine, come over here anyway. He didn't, so I went over to him and placed him under arrest for fear that he might commit some other crime." (*Id.*) Hicks's counsel cross-examined Pearce. (*Id.*)

At the conclusion of the preliminary hearing, the judge found probable cause, stating:

Well, we've got a description of somebody in a hoodie and black pants opening mailboxes. The police come, they locate a Mr. Hicks who is wearing a hoodie and black pants. He doesn't want to talk to them and he gets charged. I mean, it's close. This is not a trial to determine whether he's guilty beyond a reasonable doubt. This is a probable cause hearing and they've placed Mr. Hicks right in that area wearing the same clothes as the suspect described by a witness and seen by the police officer.

Is it more likely than not that Mr. Hicks did this? It may be. I mean, they placed him right there, basically, the same description.

I am going to bind it over, Mr. Hicks. I will leave you on the same bond so you don't have to make another bond.

7

(*Id.*)

A Sumner County grand jury returned an indictment charging Hicks with four counts of mailbox tampering. (Doc. Nos. 86-3, 92-5.) The Sumner County District Attorney dismissed all charges against Hicks on November 5, 2020. (Doc. No. 1.)

### B. Procedural History

Hicks filed this action against the State, the City, Pearce, Riley, Carr, and Gay on November 4, 2021. (Doc. No. 1.) The Court granted the State and Gay's motion to dismiss, finding that Hicks had not alleged any conduct by either defendant in his complaint. (Doc. No. 55.) The Court granted Pearce and Riley's motion to dismiss Hicks's false arrest claims but denied their motion to dismiss Hicks's malicious prosecution claims. (*Id.*)

On October 23, 2023, the City filed its motion for summary judgment (Doc. No. 84), supported by a statement of undisputed material facts (Doc. No. 85), exhibits (Doc. Nos. 86-1–86-4), and a memorandum of law (Doc. Nos. 87, 87-1). The Officers moved for summary judgment on the same day (Doc. No. 88), and supported their motion with a memorandum of law (Doc. No. 89), a statement of undisputed material facts (Doc. No. 93), declarations (Doc. Nos. 90, 91, 92), exhibits (Doc. Nos. 88-1; 90-1–90-4; 92-1–92-5), and an audio recording of the radio traffic during the events leading to Hicks's arrest (Doc. No. 97). Hicks responded to both motions. (Doc. Nos. 100, 101.) The City and the Officers filed replies. (Doc. Nos. 103, 104.)

## II. Legal Standard

In resolving a motion for summary judgment, the Court must undertake "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Under Federal Rule of Civil Procedure 56, a court must grant summary judgment if

8

the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law[,]" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The moving party bears the initial burden of demonstrating that no genuine issues of material fact exist. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets its burden, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (citation omitted); *see also Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 282 (6th Cir. 2012) ("Once a moving party has met its burden of production, 'its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.'" (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986))). The parties "must support" their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or, alternatively, by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)–(B). Courts must view the record evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009). However, if the moving party carries its initial burden, the non-moving party must show more than "[t]he mere existence of a scintilla of evidence

in support of" his or her position. *Anderson*, 477 U.S. at 252. To proceed to trial, "there must be evidence on which the jury could reasonably find" for the non-moving party. *Id.*

III.     **Analysis**

   A.     **Local Rule 56.01 and the City's and Pearce and Riley's Initial Burden Under Federal Rule Civil Procedure 56**

This Court's Local Rule 56.01 provides that "any motion for summary judgment . . . must be accompanied by a separate, concise statement of the material facts as to which the moving party contends there is no genuine issue for trial." M.D. Tenn. R. 56.01(b) (statement of undisputed material facts). Under this rule, "[e]ach fact must be set forth in a separate, numbered paragraph [and] . . . must be supported by specific citation to the record." *Id.* Any party opposing a motion for summary judgment must specifically respond to each asserted fact by: "(1) Agreeing that the fact is undisputed; (2) Agreeing that the fact is undisputed for the purpose of ruling on the motion for summary judgment only; or (3) Demonstrating that the fact is disputed. Each disputed fact must be supported by specific citation to the record." M.D. Tenn. R. 56.01(c) (response to statement of facts). "The response must be made on the document provided by the movant or on another document in which the non-movant has reproduced the facts and citations verbatim as set forth by the movant" and "must be filed with the papers in opposition to the motion for summary judgment." *Id.* Pro se parties are not excused from complying with these rules. *See* M.D. Tenn. R. 56.01(b)–(c). Indeed, the Court's scheduling order in this case instructed the parties to "refer to Federal Rule of Civil Procedure 56 and Local Rule 56.01 for summary judgment procedures[,]" described Local Rule 56.01's requirements, and warned the parties that "[f]ailure to respond in opposition to a statement of material fact may result in the Court assuming that the fact is true for purposes of summary judgment." (Doc. No. 70, PageID# 446); *see also* M.D. Tenn. R. 56.01(f) (failure to respond) ("If a timely response to a moving party's statement of material facts . . . is not

filed within the time periods provided by these rules, the asserted facts shall be deemed undisputed for purposes of summary judgment.").

The City and the Officers filed statements of undisputed material facts in compliance with Local Rule 56.01 and supported by specific record citations. (Doc. Nos. 85, 93.) Hicks's responses do not comply with Local Rule 56.01 in two ways: First, Hicks has not provided his response "on the document provided by the movant or on another document in which the non-movant has reproduced the facts and citations verbatim as set forth by the movant." M.D. Tenn. R. 56.01(c). His failure to do so is particularly detrimental in this case because the City's statement of undisputed material facts contains twenty-four statements (Doc. No. 85), the Officers' statement contains forty-six statements (Doc. No. 93), and Hicks's responses to both statements contain twenty-four responses but are not identical (Doc. Nos. 100, 101). Neither the defendants nor the Court is able to determine with certainty what response from Hicks aligns to what statement by the defendants. The Officers have provided a "submission of [Hicks's] apparent responses to [the Officers'] statement of material facts" in which they attempt to align Hicks's twenty-four responses to their forty-six statements. (Doc. No. 103-1.) Hicks has not objected to their conclusions.

Second, Hicks does not support many of the statements he claims place the defendants' asserted facts in dispute "by specific citation to the record." M.D. Tenn. R. 56.01(c)(3).

Rule 56 requires that, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact" with specific record citations, by showing that the materials cited by the opposing party do not establish the absence or presence of a genuine dispute, or that the opposing party cannot produce evidence to support the fact, the court may "consider the fact undisputed for purposes of the motion . . . ." Fed. R. Civ. P. 56(c), (e); M.D.

Tenn. R. 56.01(f) (failure to respond). The Court will consider those statements of undisputed fact to which Hicks has not responded or to which Hicks has provided an unsupported response to be undisputed for purposes of the defendants' motions for summary judgment. The defendants retain their initial burden to show an absence of any genuine dispute of material fact. *See Carver v. Bunch*, 946 F.2d 451, 454–55 (6th Cir. 1991) ("[A] party moving for summary judgment always bears the burden of demonstrating the absence of a genuine issue as to a material fact . . . regardless if an adverse party fails to respond."); *Felix v. Young*, 536 F.2d 1126, 1135 (6th Cir. 1976) ("[T]he fact that the movant's affidavits are uncontroverted does not necessarily mean that summary judgment should be granted[;] the ultimate burden of proving the propriety of summary judgment remains on the moving party.").

"Rule 56 first imposes a burden of production on the moving party to make a prima facie showing that it is entitled to summary judgment." 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2727.1 (4th ed. supp. Apr. 2023). "In this context, a 'prima facie' showing means that, in the absence of evidence to the contrary, the movant's evidence is sufficient to entitle the movant to summary judgment." 11 James Wm. Moore et al., *Moore's Federal Practice* § 56.40 (2023). Courts must view the movant's evidence in the light most favorable to the nonmovant. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970) ("[T]he moving party . . . ha[s] the burden of showing the absence of a genuine issue as to any material fact, and for these purposes the material it lodged must be viewed in the light most favorable to the opposing party."). If the moving party's evidence is insufficient, "'[n]o defense . . . is required'" and summary judgment must be denied. *Id.* at 161 (quoting 6 James Wm. Moore et al., *Moore's Federal Practice* § 56.22(2) (2d ed. 1966)); *see also* 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2727.1 (4th ed. supp. Apr. 2023) ("If the movant fails

to make that initial showing, the court must deny the motion, even if the opposing party has not introduced contradictory evidence in response.").

The Court considers whether the City and the Officers have met their initial burden before evaluating the sufficiency of Hicks's response. *See Adickes*, 398 U.S. at 160 ("'[W]here the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented.'" (quoting Fed. R. Civ. P. 56 advisory committee's note to 1963 amendment)); *see also Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1106 (9th Cir. 2000) (holding that defendant "did not carry its initial burden of production" where evidence it produced in support of motion for summary judgment "purport[ed] to negate an essential element of plaintiffs' claim—timely notice—but . . . d[id] not actually do so"). The Court "need consider only" materials cited by the parties in their summary judgment briefing, "but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3); *see also* Fed. R. Civ. P. 56(c) advisory committee's note to 2010 amendment ("[A] court may consider record materials not called to its attention by the parties.").

### B.  The Officers' Motion for Summary Judgment

Hicks asserts malicious prosecution claims against the Officers under § 1983 and Tennessee law. (Doc. No. 1.)

#### 1.  Hicks's Malicious Prosecution Claim Under § 1983

To prevail on a § 1983 claim, a plaintiff must show "(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Shadrick v. Hopkins Cnty., Ky.*, 805 F.3d 724, 736 (6th Cir. 2015) (quoting *Jones v. Muskegon Cnty.*, 625 F.3d 935, 941 (6th Cir. 2010)). To establish a Fourth Amendment violation resulting from malicious prosecution, a plaintiff must establish that (1) "'a criminal prosecution was initiated against [him]'"; (2) the defendants "ma[d]e, influence[d], or participate[d] in the

decision to prosecute"'"; (3) "'there was a lack of probable cause for the criminal prosecution'"; (4) "'"as a consequence of a legal proceeding," he suffered a "deprivation of liberty" . . . apart from the initial seizure'"; and (5) "'the criminal proceeding must have been resolved in the plaintiff's favor.'" *Mills v. Barnard*, 869 F.3d 473, 480 (6th Cir. 2017) (quoting *Sykes v. Anderson*, 625 F.3d 294, 308–09 (6th Cir. 2010)).

The Officers assert qualified immunity against Hicks's § 1983 claim. (Doc. No. 89.) "[A] defendant is entitled to qualified immunity on summary judgment unless the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established." *Bishop v. Hackel*, 636 F.3d 757, 765 (6th Cir. 2011) (citing *Pearson*, 555 U.S. at 232). "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). Where a defendant invokes qualified immunity and carries its initial summary judgment burden, "the plaintiff bears the burden to show that qualified immunity is inappropriate." *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 681 (6th Cir. 2013).

The Officers concede that Hicks has established the fourth element of a malicious prosecution claim because the charges against him were dismissed. (Doc. No. 89.) They argue that Hicks cannot show a genuine issue of material fact that the Officers "'ma[d]e, influence[d], or participate[d] in the decision to prosecute" him, that there was not probable cause for his prosecution, or that he suffered a deprivation of liberty apart from his initial seizure. (*Id.*) The Court begins with probable cause.

The Officers argue that the General Sessions Court's finding of probable cause after a preliminary hearing precludes Hicks from relitigating that issue in this Court. "A state-court

judgment is given the same preclusive effect [in federal court] that it would have under the law of the state in which the judgment was rendered." *Buttino v. City of Hamtramck*, 87 F. App'x 499, 502 (6th Cir. 2004) (citing *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984)). To establish that collateral estoppel precludes a redetermination of probable cause here, Tennessee law requires the Officers to show:

> (1) that the issue to be precluded is identical to an issue decided in an earlier proceeding, (2) that the issue to be precluded was actually raised, litigated, and decided on the merits in the earlier proceeding, (3) that the judgment in the earlier proceeding has become final, (4) that the party against whom collateral estoppel is asserted was a party or is in privity with a party to the earlier proceeding, and (5) that the party against whom collateral estoppel is asserted had a full and fair opportunity in the earlier proceeding to contest the issue now sought to be precluded.

*Bowen ex rel. Doe v. Arnold*, 502 S.W.3d 102, 107 (Tenn. 2016) (quoting *Mullins v. State*, 294 S.W.3d 529, 535 (Tenn. 2009)).

The Court denied the Officers' motion to dismiss Hicks's malicious prosecution claims on collateral estoppel grounds because they had not met the second element of the Tennessee law test. (Doc. No. 55.) The Court found that the Officers' estoppel argument "overlook[ed] almost entirely [Hicks's] allegations that Riley's arrest warrant was based on knowingly false statements and that Pearce provided knowingly false testimony at Hicks's preliminary hearing." (*Id.*) Specifically, Hicks alleged that Riley falsely stated in his affidavit that multiple witnesses—not just Abshar— had described and identified Hicks as the mailbox tamperer. (Doc. Nos. 1, 53.) Hicks also argued that "dispatch audio later showed" parts of Pearce's preliminary hearing testimony to be false. (Doc. Nos. 39, 53.) The Court found that, because Hicks alleged that the state court's finding of probable cause was based on the Officers' false statements and testimony, he was "not attempting to relitigate the identical issue of whether probable cause exists; rather, [he was] arguing that the officers misstated material facts in order to establish probable cause at the state level." *Darrah v.*

*City of Oak Park*, 255 F.3d 301, 311 (6th Cir. 2001). In that circumstance, "the state court's determination of probable cause at the preliminary hearing is not identical to the issue" raised in the § 1983 malicious prosecution claim and collateral estoppel does not bar the federal claim. *Id.*; *see also Sykes v. Anderson*, 625 F.3d 294, 310 n. 8 (6th Cir. 2010) (holding that, "when a malicious prosecution claim 'is based on a police officer's supplying false information to establish probable cause, the determination of probable cause that the state court made at the Plaintiffs' preliminary hearing does not carry preclusive effect in the instant case'"). Thus, a judicial determination of probable cause following a preliminary hearing "has no preclusive effect *if* there is evidence that the claim of malicious prosecution is based on a police officer's supplying false information to establish probable cause[.]" *Peet v. City of Detroit*, 502 F.3d 557, 566 (6th Cir. 2007) (citing *Hinchman v. Moore*, 312 F.3d 198, 202-03 (6th Cir. 2002)). While a showing of actual malice is not required, the plaintiff must establish "deliberate or reckless falsehoods"; "mere negligence" is not enough. *See Johnson v. Moseley*, 790 F.3d 649, 654–55 (6th Cir. 2015).

The Officers raise the issue of the preliminary hearing's preclusive effect again at summary judgment and argue that, after discovery and on the more fulsome summary judgment record, Hicks cannot show a question of fact that the probable cause determination at the preliminary hearing "'was influenced by falsified evidence.'" (Doc. No. 89, PageID# 666 (quoting *York v. City of Lewisburg, Tennessee*, No. 1:19-CV-00098, 2022 WL 411843, at *3 (M.D. Tenn. Feb. 9, 2022).) This Court need not engage in a collateral estoppel analysis to resolve the question of whether a genuine issue of material fact exists as to probable cause. "If this court finds that there was probable cause to prosecute [Hicks], regardless of any alleged false statements made by [the Officers], then [Hicks] cannot make out a malicious prosecution claim under the Fourth Amendment" regardless of whether collateral estoppel applies. *Darrah v. City of Oak Park*, 255

F.3d 301, 312 (6th Cir. 2001); *see also McKinley v. City of Mansfield*, 404 F.3d 418, 445 (6th Cir. 2005) (finding this principle "firmly established" in the Sixth Circuit).

Probable cause exists where "the 'facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Barrera v. City of Mount Pleasant*, 12 F.4th 617, 620 (6th Cir. 2021) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)). Here, Hicks's claim turns on whether the preliminary hearing testimony established sufficient facts and circumstances from which a prudent person could believe that he "knowingly . . . tamper[ed] with a residential mailbox or other container [he knew] or reasonably should [have known] is used for the receipt or deposit of United States mail." Tenn. Code Ann. § 39-14-412(a) (establishing the offense of mailbox tampering under Tennessee law).

### a.    Pearce's Preliminary Hearing Testimony

Hicks is correct that there are inconsistencies among the recountings of his arrest in the preliminary hearing testimony, "dispatch tapes," Riley's affidavit, Pearce's supplemental report, and the other exhibits that the Officers provide to support their summary judgment motion. For example, Hicks points out that Pearce states in her supplemental report that "it was not until AFTER Officer Pearce showed Ms. Absher multiple pictures of [Hicks] on two different occasions that any mention of the suspect being Caucasian or wearing black pants was mentioned." (Doc. No. 101.) The summary of radio traffic shows that dispatch did not initially have a description of the suspect and that an officer asked dispatch to call back the complainant to get one.[3] (Doc. No.

---

[3]    In the radio traffic summary, "101" refers to Carr, "112" refers to Pearce, and "115" refers to Riley. (Doc. Nos. 90, 92.)

90-2.) Approximately fifteen minutes later, Pearce states on the radio that the suspect "[w]as wearing a light gray hoodie that covered his face, approximately 5-11, slim build, someone saw him on foot." (Doc. No. 90-2.) Pearce's supplemental report states that Absher initially described the suspect as "a white man, approximately 5'11", slim build, and he was wearing a light grey hoodie with the hood covering the majority of his head." (Doc. No. 92-3.) No mention of black pants in either description, although Absher did identify the suspect's race. And, consistent with her supplemental report, Pearce testified at the preliminary hearing that she was "not a hundred percent certain" that Absher had mentioned black pants in her initial description.[4]

Hicks also disputes that Absher positively identified him when Pearce first showed Absher his photograph, pointing out that Pearce states in her summary judgment declaration that, when she went back to Absher's house to talk to her for a second time, Absher "was not certain [that Hicks was the suspect] based on the photographs that [Pearce] showed her" (Doc. No. 92). (Doc. No. 101.) Hicks is correct that Pearce did not say in her preliminary hearing testimony that she had returned to Absher's house to show her a photograph of Hicks. Instead, Pearce testified that, when Absher drove by the officers on her way to work, Pearce "asked her if the gentleman walking around outside – and I showed her a picture as I asked her of [Hicks], if that was who she saw" and that Absher replied "yes, I am 100 percent certain that is him." (Doc. No. 86-3.) Absher, in turn, testified that she drove up to the officers on her way to work and they asked her "about the man sitting on the curb"; Absher confirmed that man was the suspect because "[he] was wearing the exact same thing" as the man she had seen walking around. (Doc. No. 86-3.) When asked on cross-examination how she could know Hicks was the suspect, Absher stated "[h]e was wearing

---

[4]    Hicks also generally disputes that "he 'perfectly matched' the limited description given by [Absher]." But Hicks does not say how he did not match Absher's description, and the description Pearce termed "limited" was the description from dispatch, not Absher.

the exact same thing" and that she knew the clothes were the same garments "[b]ecause it was a gray hoodie and black pants." (*Id.*) Absher confirmed that "they show[ed her] a picture of [Hicks] and said is that the guy" and that she answered "yes." (*Id.*) She confirmed that "the guy was sitting on the curb without his hood on . . . and the guy in the picture that [she was] shown [were] the same guy." (*Id.*) Taking the testimony in the light most favorable to Hicks, there is a dispute as to whether, when, and with what degree of certainty Absher identified Hicks from a photograph.

But there is no dispute that Absher testified at the preliminary hearing that she identified Hicks when she saw him in person on her way to work because he was wearing "the exact same thing" as the man she saw looking in mailboxes. And there is no dispute that Pearce testified Absher said she was "100 percent certain" Hicks was the same man when she saw him in person on her way to work. While there are differences in the various retellings, none of those differences creates a genuine issue of material fact as to whether Pearce offered false testimony at the preliminary hearing or whether Absher identified Hicks as the man she saw opening mailboxes.

Taking into account the discrepancies Hicks identifies and viewing the evidence in the light most favorable to Hicks's position, the record shows no genuine issue of material fact that probable cause existed for Hicks's prosecution. The summary judgment record also shows no genuine issue of material fact from which a reasonable jury could find that the General Sessions Court based its probable cause finding on false or misleading testimony. Having made an independent finding of no genuine issue of material fact regarding probable cause, the Court "need not proceed any further . . . to decide Hicks's malicious prosecution claim" against the Officers. *Darrah*, 255 F.3d at 312.

### b.     Riley's Affidavit

Riley does not dispute that he swore in an affidavit supporting the criminal complaint that "several witnesses" observed the mailbox tampering, gave a "good description" of the suspect, and "were able to identify the suspect [as Hicks]." (Doc. No. 90-3.) He also does not dispute that only

one witness—Absher—provided a description of the mailbox tamperer and identified Hicks as the suspect. Riley states at summary judgment that he is "not sure why" he swore there were multiple witnesses whose identifications led to Hicks's arrest "other than I do not believe I spoke to the residents at 1001 Heather Drive or 1003 Heather Drive and may have had the impression that they saw the Incident." (Doc. No. 90.) Hicks cites the "police reports, radio traffic and Officer Pearce['s] testimony" establishing that Absher was the only witness who provided a description of the tamperer in response. (Doc. No. 101.) A genuine issue of material fact exists in the summary judgment record as to whether Riley intentionally included a false statement about the number of witnesses supporting Hicks's identification in his affidavit supporting Hicks's arrest.

The question thus becomes whether any false statement Riley made in the complaint affidavit "can survive a number of intervening decisions by others such that [Riley] can still be said to have influenced or participated in the decision to institute criminal proceedings." *Sykes*, 625 F.3d at 314. An officer's false statements in an arrest may be relevant in a malicious prosecution claim where the officer repeats the false statements in preliminary hearing testimony, where the false statements are introduced as evidence supporting the prosecution at a preliminary hearing, or where the officer's "'knowing misstatements . . . to the prosecutor'" or his "'pressure or influence" affect the decision to prosecute. *Id.* at 316 (quoting *Reed v. City of Chicago*, 77 F.3d 1049, 1053 (7th Cir. 1996)). If the false statements are not offered at the preliminary hearing or do not otherwise influence the decision proceed to trial, the independent decision-making at the preliminary hearing breaks the "'chain of causation'" between the falsehood and a finding of probable cause. *Id.* (quoting *Senra v. Cunningham*, 9 F.3d 168, 174 (1st Cir. 1993)).

There is no dispute that Riley's affidavit statements went no further than the swearing out of the complaint. At some time thereafter, Riley "ha[d] a conversation with a Deputy District

Attorney General about his lack of direct knowledge about what witnesses had stated, so the decision was made to not call [ ] Riley as a witness at the preliminary hearing in General Sessions Court or at the presentment to a grand jury." (*Id.* at PageID# 761, ¶ 31.) Riley also "did not have any communications with the District Attorney General about whether the case should be prosecuted and was not consulted when the decision was made to dismiss the case against" Hicks. (*Id.* at PageID# 762, ¶ 32.) And all testimony at the preliminary hearing was that only Absher identified Hicks before his arrest. The intervening event of the preliminary hearing thus effectively nullifies any false statement Riley may have included in his affidavit for purposes of a malicious prosecution claim. *See id.* (citing *Taylor v. Meacham*, 82 F.3d 1556, 1563–64 (10th Cir.1996) (holding that no claim could be sustained against a sheriff who may have "set in motion a malicious prosecution" because the "preliminary hearing broke the 'chain of causation'" and there was no evidence that the sheriff "made false or misleading statements following [the plaintiff's] arrest, nor that he somehow caused false or perjured testimony to be presented at the preliminary hearing"); *McKinley v. City of Mansfield*, 404 F.3d 418, 444 (6th Cir. 2005) (holding that malicious prosecution claim failed because plaintiff "present[ed] no evidence suggesting that defendants conspired with, influenced, or even participated in, [the prosecutor's] decision to bring charges against [the plaintiff]"); *Hollis v. Bullard,* No. 10-10729, 2011 WL 5184228, at *5 (E.D. Mich. Nov. 1, 2011) (participation element not satisfied, because, "other than [ ] presumably providing his police report to the prosecutor and being identified as the complaining witness, Plaintiff produces no evidence that [the officer] actually conferred with the prosecutor in deciding to prosecute plaintiff").

* * *

Because the Court finds no question of fact in the summary judgment record that there was probable cause to support Hicks's prosecution absent any consideration of the Officers' alleged false statements and testimony, there is no dispute that the Officers' conduct did not violate Hicks's constitutional rights. The Officers are therefore entitled to qualified immunity from Hicks's § 1983 malicious prosecution claims. *See Tanner v. Walters*, 98 F.4th 726 (6th Cir. 2024) (holding that "'[w]hen a defendant invokes qualified immunity in a motion for summary judgment, the plaintiff must offer sufficient evidence to create a genuine dispute of fact that the defendant violated a clearly established right" quoting *Folks v. Petit*, 676 F. App'x 567, 569 (6th Cir. 2017)).

### 2. Hick's Malicious Prosecution Claim Under Tennessee Law

A claim for malicious prosecution under Tennessee law requires a plaintiff to show "that (1) a prior suit or judicial proceeding was instituted without probable cause, (2) defendant brought such prior action with malice, and (3) the prior action was finally terminated in plaintiff's favor." *Roberts v. Fed. Exp. Corp.*, 842 S.W.2d 246, 248 (Tenn. 1992).

The Court's determination that summary judgment is appropriate on Hicks's § 1983 claim dictates that summary judgment is also appropriate on Hicks's claim under Tennessee law. The Sixth Circuit recently addressed this issue in *Weser v. Goodson*, 965 F.3d 507, 517 (6th Cir. 2020). The Sixth Circuit summarized the district court's findings on appeal as follows:

> The district court did not analyze Weser's state-law claims as distinct from her federal ones. It instead reasoned that 'the absence of probable cause is . . . essential to each of Plaintiff's state and federal claims.' After concluding that Anderson had probable cause to arrest Weser, the court granted summary judgment in Anderson's favor on all of Weser's state and federal claims against him.

*Id.* (alteration in original). The Court found that "[t]his outcome [was] appropriate with respect to the state-law malicious[ ] prosecution claim" because the probable cause determination that plaintiff had in fact committed the charged offense "disposes of her state-law malicious[ ] prosecution claim." *Id.*

Hicks does not argue that the outcome of his state law malicious prosecution claim "should not simply mirror the result on the federal" malicious prosecution claim; indeed, Hicks's only argument in opposition to summary judgment on his state law claim is "see above[,]" referencing the arguments made with respect to his federal claim.

Accordingly, the Officers are entitled summary judgment as a matter of law on Hicks's state law malicious prosecution claim.

### C.    The City's Motion for Summary Judgment

Hicks asserts municipal liability claim against the City under § 1983 and the Tennessee Governmental Tort Liability Act (GTLA). (Doc. No. 1.) The City argues that it is entitled summary judgment on both claims.

### 1.    Hicks's Municipal Liability Claim Under § 1983

Hicks asserts municipal liability claims against the City under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 694 (1978). (Doc. No. 1.) Hicks alleges that the City's "customs, polices, and procedures, and training were the motivating force behind [his] arrest and prosecution . . . along with other actions that led to violation of [his] constitutional rights." (Doc. No. 1, PageID# 14, ¶ 7.3.) Hicks also alleges that the City "failed to adequately train its police officers" on "when to make an arrest on a misdemeanor committed outside an officers' presence, how to determine probable cause, [and] how and when to conduct photo lineups[.]" (Doc. No. 1, PageID# 15, ¶ 7.4) Hicks further alleges that the city "contemporaneously approved and ratified the conduct and actions of . . . Pearce, . . . Riley, [and] . . . Carr." (Doc. No. 1, PageID# 14, ¶ 7.2.) Hicks alleges that the City should have known that these "failure to train and inadequate training issues would result in constitutional violations[,]" and that the City should be "held vicariously liable for the actions of its officers." (Doc. No. 1, PageID# 15, 16, ¶¶ 7.7, 7.9.) Hicks therefore asserts that the City is liable under § 1983 for having inadequate policies on how

to determine probable cause and how to use photographs for suspect identification; for its ratification of the individual officers' actions in arresting Hicks; and for its failure to train its officers appropriately on these issues. (Doc. No. 1.)

To prevail on a § 1983 *Monell* claim against the City, Hicks must show "(1) that [he] suffered a constitutional violation and (2) that a municipal policy or custom directly caused the violation." *Hardrick v. City of Detroit, Michigan*, 876 F.3d 238, 243 (6th Cir. 2017) (citing *Monell*, 436 U.S. at 690–92). Hicks's municipal liability claim fails at the first step because he cannot show a genuine issue of material fact that he suffered a constitutional violation.

The constitutional violation associated with Hicks's claim against the City based on the officers' on-the-scene probable cause determination and use of a photo "show up" to identify him is false arrest. The Court has already determined that Hicks's false arrest claims against the Officers are time-barred (Doc. No. 53), and the same analysis applies to any claim against the City. Because the Court has found no genuine issue of material fact that Hicks was subject to malicious prosecution, any *Monell* claim based on that alleged constitutional violation must also fail. The City is therefore entitled to summary judgment as a matter of law. *See Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 900 (6th Cir. 2004) ("A municipality or county cannot be liable under § 1983 absent an underlying constitutional violation by its officers."); *see also Lemon,* 2021 WL 323250, at *17 (granting summary judgment to the City of Detroit on plaintiff's *Monell* claim because plaintiff "has not shown that [police officer] (or any other employee or officer of the City of Detroit) violated [plaintiff's] constitutional rights" in the context of plaintiff's malicious prosecution claim) (citing *Blackmore*, 390 F.3d at 900)); *see also Jordan v. City of Detroit*, No. 11-cv-10153, 2012 WL 2526927, at *7–8 (E.D. Mich. June 29, 2012) (finding plaintiff's § 1983

malicious prosecution claim is barred by collateral estoppel and county was entitled to summary judgment on plaintiff's municipal liability claim), *aff'd*, 557 F. App'x 450 (6th Cir. 2014).

### 2. Hicks's TGTLA Claim

Hicks also brings a claim against the City under the Tennessee Governmental Tort Liability Act (TGTLA), Tenn. Code Ann. § 29-20-101 *et seq.* (Doc. No. 1.) The TGTLA "codifies Tennessee's common law rules concerning sovereign immunity and states exceptions to the general grant of immunity from suit." *Warren v. Metro Gov't of Nashville*, 2015 WL 3417844, at *7 (M.D. Tenn. May 27, 2015) (citing *Limbaugh v. Coffee Med. Ctr.*, 59 S.W.3d 73, 79 (Tenn. 2001)). As except otherwise stated within the TGTLA, "all governmental entities shall be immune from suit for any injury which may result from the activities of such governmental entities wherein such governmental entities are engaged in the exercise and discharge of any of their functions, governmental or proprietary." Tenn. Code Ann. § 29-20-201(a) (West).

The City argues that it is entitled summary judgment as a matter of law because the TGTLA's one-year statute of limitation bars Hicks's claim against it; the TGTLA's "civil rights" exception immunizes the City from any negligence claim; and the TGTLA preserves immunity from any injury arising out of malicious prosecution. (Doc. No. 96.) The Court need not consider the application of the TGTLA's immunity provisions, however, because it has found that Hicks cannot show a genuine issue of material fact that he suffered malicious prosecution under Tennessee law and that his false arrest claim is untimely. Hicks does not allege that the City is liable for any other torts. Summary judgment for the City is therefore appropriate.

## IV. Recommendation

For these reasons, the Magistrate Judge RECOMMENDS that the City's motion for summary judgment (Doc. No. 84) and Pearce and Riley's motion for summary judgment (Doc.

No. 88) be GRANTED and that summary judgment be entered in the City's and Pearce and Riley's favor.

Any party has fourteen days after being served with this Report and Recommendation to file specific written objections. Failure to file specific objections within fourteen days of receipt of this Report and Recommendation can constitute a waiver of appeal of the matters decided. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004). A party who opposes any objections that are filed may file a response within fourteen days after being served with the objections. Fed. R. Civ. P. 72(b)(2).

Entered this 19th day of August, 2024.

ALISTAIR E. NEWBERN
United States Magistrate Judge