UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

|  |  |
|---|---|
| MASON ROBERT JAMES HICKS,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF MILLERSVILLE et al.,<br><br>Defendants. | Case No. 3:21-cv-00837<br><br>Judge Aleta A. Trauger<br>Magistrate Judge Alistair E. Newbern |

To: The Honorable Aleta A. Trauger, District Judge

**REPORT AND RECOMMENDATION**

Pro se plaintiff Mason Robert James Hicks brought this action alleging that his civil rights were violated by the City of Millersville, Tennessee, and several of its police officers when he was arrested and prosecuted for mailbox tampering. (Doc. No. 1.) After years of litigation, Defendant Dustin Carr is the only remaining defendant in the action. Carr sought the Court's leave to file a motion for summary judgment more than nine months after the deadline to file dispositive motions had passed. (Doc. No. 107.) Recognizing that Carr had not shown good cause for missing the filing deadline but weighing that failure against "its own limited resources, the many other cases on its docket, and the interests of judicial efficiency," the Court granted Carr's motion and ordered him to file a motion for summary judgment. (Doc. No. 113.)

Carr did not follow the Court's direction. Instead, Carr filed a three-page motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). (Doc. No. 114.) Hicks has responded in opposition to the motion (Doc. No. 121), and Carr has filed a reply (Doc. No. 122). For the reasons that follow, the Magistrate Judge will recommend that Carr's motion to dismiss (Doc. No. 114) be denied.

However, the Magistrate Judge will recommend that the Court grant summary judgment independent of a party's motion under Federal Rule of Civil Procedure 56(f)(1).

I.  **Background**

   A.  **Factual Background**

The Court summarized the relevant factual background of Hicks's claims in its report and recommendation on the motions for summary judgment filed by the City of Millersville and Defendants Pearce and Riley. (Doc. No. 109.) Based on the evidentiary record established by Hicks and those defendants, the Court found as follows:

   1.  **March 18, 2019 Arrest**

In 2019, Hicks had been living at 1000 Heather Drive in Goodlettsville, Tennessee, for "roughly 16 [or] 15 years" with "[his] mom, dad, brother[,] and sister." (Doc. No. 86-1, PageID# 493.) On March 18, 2019, at approximately 12:11 p.m., Summer County Police Department dispatch received a 911 call that Allison Absher, who lived at 998 Heather Drive, had seen a suspicious "male walking up and down the road trying to get into cars" and "going through [residents'] mailboxes ...." (Doc. No. 90-1, PageID# 698; Doc. Nos. 85, 100.) Pearce responded to the 911 call and was the first officer to arrive on Heather Drive. (Doc. Nos. 90, 90-2.) Pearce parked her car in front of Absher's residence and began to observe the area. (Doc. Nos. 85, 100.) A few minutes later, Pearce called Emmanuel Manoloules, a White House, Tennessee, police officer with whom Pearce had previously worked and who she knew lived at 1005 Heather Drive; Pearce gave Manoloules "a description of all vehicles" as "[she] drove through the neighborhood." (Doc. No. 86-3, PageID# 603; Doc. No. 92-3.) Manoloules told Pearce that "[a]ll the vehicles ... that [she] described to him ... did belong in the neighborhood." (Doc. No. 86-3, PageID# 603; Doc. No. 90.)

Riley and Carr also responded to the 911 call. Carr instructed Riley to "stay out of the neighborhood where the [i]ncident occurred while [Carr] and ... Pearce went to Heather Drive to look for a suspect." (Doc. No. 90, PageID# 691, ¶ 5; Doc. No. 92.) Pearce and Carr saw a black Mercedes travel down Heather Drive and leave the subdivision, which they considered suspicious. (Doc. Nos. 90-2, 92-4.) Neither Pearce nor Carr was able to get the license plate number of the Mercedes to do a registration check. Riley, however, spotted the car outside the subdivision and ran the license plate number, which identified the Mercedes as registered to Shawn Stine. (Doc. No. 90-2, PageID# 705; Doc. No. 90.) Manoloules informed Pearce that the Mercedes "did not belong in the neighborhood." (Doc. No. 90-2, PageID# 705; Doc. No. 92, PageID# 720–21, ¶ 9.)

2

Carr instructed Riley to stop the Mercedes and Pearce to get a description of the mailbox-tampering suspect from Absher. (Doc. No. 90-2.) Absher told Pearce that the suspect "was wearing a light gray hoodie that covered his face, was approximately 5-11, slim build, [and] ... on foot." (Doc. No. 90-2, PageID# 705; Doc. No. 92.) Stine, who was driving the Mercedes, told Riley that he was in the neighborhood to conduct a real-estate appraisal. Stine later stated that he "do[es] not remember what [he] was wearing that day"; he "do[es] not believe that [he] would have been wearing a hoodie" but "might have been wearing a hat." (Doc. No. 91, PageID# 716, ¶¶6–7.) Riley ruled out Stine as suspect and let him leave. (Doc. No. 90.)

Carr, Pearce, and Riley then "converged on Heather Drive and were talking in front of" Manoloules's residence. (Doc. No. 92, PageID# 721, ¶ 12.) Pearce saw Hicks emerge from a house across the street and "pac[e] back and forth in front of his residence and in the street ...." (Doc. No. 92, PageID# 721, ¶ 12.) Hicks took photographs and video of the officers, and Pearce took four photographs of Hicks. (*Id.*; Doc. No. 90.) Hicks "was wearing a light gray hoodie." (Doc. No. 92, PageID# 721, ¶ 12.)

Because Hicks's hoodie matched the description that Absher had given Pearce of the suspected mailbox tamperer, Pearce walked back to Absher's residence "to see if [Hicks] could possibly be the person [ ] Absher had seen." (Doc. No. 92, PageID# 721, ¶ 13.) Pearce showed Absher the photographs of Hicks she had just taken, and "Absher said she believed the person depicted in [them] ... was the same person she had seen tampering with the mailboxes, but she was not certain based on [these] photographs ...." (Doc. No. 92, PageID# 721, ¶ 13.) Pearce relayed to the other officers that Absher "believe[d] that may be the individual." (Doc. No. 90-2, PageID# 706.) Absher also identified three houses where she thought the suspect had opened the mailbox, including Manoloules's house. (Doc. No. 92.)

Pearce rejoined the other officers in front of Manouloules's house, where Hicks was "still pacing back and forth" across the street. (Doc. No. 92, PageID# 722, ¶ 15.) As Absher left for work, she drove up to the officers and saw Hicks "sitting on the curb[,]" wearing "[a] gray hoodie and black pants." (Doc. No. 92-4, PageID# 738.) Absher stated that it was the "same gray hoodie and black pants that [she] had seen the person wearing earlier[.]" (*Id.*) Pearce and Riley state that Absher was "100% certain" that Hicks was the person she had seen tampering with the mailboxes. (Doc. Nos. 93, 101.) Pearce then spoke to Manoloules and the other mailbox owners, and all stated they wanted to press charges against the tamperer. (Doc. No. 90, PageID# 692, ¶ 13.)

Hicks states that, while he was standing outside his house watching the officers, he saw his neighbor also standing outside and decided to "go talk to her and have her clear [his] name [because] she would [have known] [that] [Hicks]" was not involved in the mailbox tampering. (Doc. No. 86-1, PageID# 503.) Hicks states that, before he could do so, "[Pearce] told [him] to freeze[,] so [he] stood still

and then she told [him] he was under arrest." (*Id.*) Pearce states that she "called out for [Hicks]" to come talk to her, but Hicks responded that he wouldn't talk to her without an attorney present. Pearce states that she then walked towards Hicks and "placed him under arrest for fear that he might commit some other crime." (Doc. No. 92-4, PageID# 741.) Hicks was placed in Riley's vehicle and transported to the Millersville Police Department. (Doc. Nos. 90, 92.)

At the police station, Riley prepared an affidavit of complaint under Carr's supervision. (Doc. Nos. 90, 92.) Riley's affidavit states:

On Monday the 18th day of March, 2019, Officers were dispatched to the area of Heather Drive for a suspicious person walking down the road opening mailboxes. When officers arrived[,] they spoke with several witnesses and w[ere] given a good description of a suspect. Officers noticed a white male matching the description of the male that was tampering with mailboxes coming out of 1000 Heather Drive. Witnesses were able to identify the suspect, Mason Hicks. I, Officer Riley put Mr. Hicks in custody for Tampering with mailboxes. [Signed] BR."

(Doc. No. 90-3.) Riley states that he then took Hicks to the Sumner County Jail, where the commissioner told him to handwrite the following language at the end of his statement: "due to the fact that there is a reasonable likelihood that the offense would continue or that property would be endangered." (Doc. No. 90, PageID# 693, ¶ 16.) Riley states that "[he is] not sure why [he] used the plural" to state that more than one witness identified Hicks but that he may have "had the impression" that other residents of Heather Drive who pressed charges "saw the [i]ncident." (Doc. No. 90, PageID# 693, ¶15.) Pearce states that Riley "may not have known that neither resident had seen the mailbox tampering take place." (Doc. No. 92, PageID# 722–23, ¶ 18.) Riley and Pearce completed supplemental reports memorializing the day's events. (Doc. Nos. 90-4, 92-3.)

Hicks was charged with mailbox tampering and held on a $500.00 bond, which Hicks's father paid in cash on the day of his arrest.

### 2. Summer County Criminal Prosecution

A preliminary hearing was held in Sumner County General Sessions Court on July 15, 2019. (Doc. No. 86-3.) Hicks appeared at the hearing represented by counsel. (Doc. No. 86-3.) The prosecution called Absher and Pearce as witnesses. (*Id.*) Riley states that he spoke with "a Deputy District Attorney General about [his] lack of direct knowledge about what witnesses had stated, so the decision was made to not call [him] as a witness at the preliminary hearing ... or at the presentment to a grand jury." (Doc. No. 90, PageID# 693, ¶ 17.)

Absher testified on direct examination that, on the morning of March 18, she went outside her house and "saw a man standing there in a gray hoodie and black pants." (Doc. No. 86-3.) The man was "opening the mailbox and they opened

a car door, a tan car ... in front of the house with the mailbox that he opened." (*Id.*) The man did not take anything from the car or mailbox, but "went across the street and looked in the mailbox across the street." (*Id.*) Absher called her brother and told him what she had seen; her brother called the police. (*Id.*) Pearce then arrived at Absher's house, and Absher "told her what [she] had s[een] and gave them a description" of the tamperer. (*Id.*) When Absher left for work, she "drove over to where Officer [Pearce] was and asked her if she needed anything else from me" and saw Hicks "sitting on the curb" wearing "[a] gray hoodie and black pants." (*Id.*) Absher stated that it was "the same gray hoodie and black pants that [she] had seen the person wearing earlier." (*Id.*) On cross-examination, Absher testified that she identified Hicks as the suspect because "[h]e was wearing the exact same thing." (*Id.*) Absher also testified that Pearce showed her a picture of Hicks and that she was able to say "that the guy sitting on the curb and the guy in the picture ... [were] the same guy[.]" (*Id.*)

Pearce testified on direct examination about arriving in the area after the 911 call and the stop of the Mercedes. (*Id.*) She testified that, when Hicks came out of his house that morning, "based on his clothing description, we suspected that he might be the one that hade been possibly tampering with mailboxes." (*Id.*) Pearce testified that the officers did not immediately talk to Hicks and that Hicks "was outside pacing around, taking pictures, taking videos of us ...." (*Id.*) Pearce and the other officers "were standing in front of Officer Manouloules's house and [Manouloules's] residence was one of the ones that Ms. Absher indicated the suspect had opened along with the house at 1003 and 1001." (*Id.*) When Absher drove up to the officers, Pearce asked her "if the gentleman walking around outside — and I showed her a picture as I asked her of [Hicks], if that was who she saw, and she replied, yes, I am 100 percent certain that is him." (*Id.*) Pearce testified that she called out to Hicks to come talk to her and he replied he would not without an attorney. (*Id.*) Pearce said, "that's fine, come over here anyway. He didn't, so I went over to him and placed him under arrest for fear that he might commit some other crime." (*Id.*) Hicks's counsel cross-examined Pearce. (*Id.*)

At the conclusion of the preliminary hearing, the judge found probable cause, stating:

Well, we've got a description of somebody in a hoodie and black pants opening mailboxes. The police come, they locate a Mr. Hicks who is wearing a hoodie and black pants. He doesn't want to talk to them and he gets charged. I mean, it's close. This is not a trial to determine whether he's guilty beyond a reasonable doubt. This is a probable cause hearing and they've placed Mr. Hicks right in that area wearing the same clothes as the suspect described by a witness and seen by the police officer.

Is it more likely than not that Mr. Hicks did this? It may be. I mean, they placed him right there, basically, the same description.

> I am going to bind it over, Mr. Hicks. I will leave you on the same bond so you don't have to make another bond.
>
> (*Id.*)
>
> A Sumner County grand jury returned an indictment charging Hicks with four counts of mailbox tampering. (Doc. Nos. 86-3, 92-5.) The Sumner County District Attorney dismissed all charges against Hicks on November 5, 2020. (Doc. No. 1.)

*Hicks v. City of Millersville*, No. 3:21-CV-00837, 2024 WL 4127620, at *1–4 (M.D. Tenn. Aug. 19, 2024).

### B. Relevant Procedural History

Hicks initiated this action on November 4, 2021, by filing a pro se complaint bringing false arrest and malicious prosecution claims under 42 U.S.C. § 1983 and Tennessee law against the City of Millersville, Millersville Police Department Officers Melissa Pearce and Blake Riley, Millersville Assistant Police Chief Dustin Carr, the State of Tennessee, and Judge Dee Gay. (Doc. No. 1.) Counsel entered appearances to represent Carr on February 3, 2022, and answered Hicks's complaint. (Doc. Nos. 14, 15, 28.)

Gay and the State of Tennessee moved to dismiss Hicks's complaint (Doc. No. 18), as did Pearce and Riley (Doc. No. 24). The City of Millersville moved for summary judgment. (Doc. No. 41.) On September 13, 2022, the Court granted Gay and the State's motion to dismiss in full and granted Pearce and Riley's motion to dismiss in part, dismissing Hicks's false arrests claims under § 1983 and state law. (Doc. Nos. 52, 55.) On February 9, 2023, the Court denied the City's motion for summary judgment without prejudice to refiling in compliance with the Court's Local Rules. (Doc. Nos. 68, 69.) The case thus proceeded against Pearce, Riley, Carr, and the City of Millersville.

On October 23, 2023, the Court received motions for summary judgment filed by the City of Millersville (Doc. No. 84) and Pearce and Riley (Doc. No. 88). On August 6, 2024, Carr's

counsel moved for an extension of the October 23, 2023 dispositive motion deadline, which Hicks opposed. (Doc. Nos. 107, 112.)

On August 19, 2024, the Magistrate Judge issued a report and recommendation recommending that the Court grant the City, Pearce, and Riley's motions for summary judgment. (Doc. No. 109.) The Court adopted the report and recommendation in full. (Doc. No. 111.)

On March 31, 2025, the Court granted Carr's motion to extend the dispositive motion deadline. (Doc. No. 113.) The Court found that, because the deadline Carr sought to extend had expired long before he filed his motion, the motion was governed by the "excusable neglect" standard set by Federal Rule of Civil Procedure 6(b). (*Id.*) The Court found that "[m]ost of the factors the Court considers in evaluating whether a motion to extend an expired deadline is based on excusable neglect [did] not weigh in Carr's favor." (*Id.*) Rather, the Court found that

> [t]he length of Carr's counsel's [nine-month] delay in requesting an extension is significant . . . The delay was well within counsel's control to prevent, as he had many reminders during those nine months that the time to file dispositive motions had come and gone . . . The explanation Carr's counsel provides for this delay—his co-counsel's withdrawal from representation—is the same reason he gave for his failure to respond to Hicks's discovery requests nearly a year earlier. Counsel's candid assessment that he did not give this case top priority seems a more plausible account.

(*Id.*)

The Court found that Hicks's claim of prejudice resulting from Carr's delay—that he assumed Carr had forfeited his opportunity to move for summary judgment and intended to go to trial—was reasonable on the record. However, the Court also found that Hicks had not argued that he had invested time or resources in trial preparation or otherwise litigating the case during the period of Carr's delay. (*Id.*) Finally, the Court recognized its "broad discretion" to control its docket and weighed the considerations of "its own limited resources, the many other cases on its docket, and the interests of judicial efficiency" against "Carr's counsel's conduct and any resulting

7

prejudice to Hicks." (*Id.*) The Court found that "the scale tips very slightly in favor of allowing Carr's counsel to file an untimely motion for summary judgment" and afforded Carr fourteen days in which to do so. (*Id.*)

The next day, Carr filed a three-page motion to dismiss "all claims filed against him" pursuant to "Tennessee's law of the case doctrine" and Federal Rule of Civil Procedure 12(b)(6). (Doc. No. 114.) Hicks filed a response in opposition to Carr's motion (Doc. No. 121), and Carr has filed a reply (Doc. No. 122).

## II. Legal Standard

### A. Federal Rule of Civil Procedure 12(b)(6)

In deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must "construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff." *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016). Federal Rule of Civil Procedure 8(a)(2) requires only that a complaint contain "a short and plain statement of the claim[.]" Fed. R. Civ. P. 8(a)(2). However, "[t]he factual allegations in the complaint need to be sufficient to give notice to the defendant as to what claims are alleged, and the plaintiff must plead 'sufficient factual matter' to render the legal claim plausible, i.e., more than merely possible." *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). A plaintiff must plead more than "'labels and conclusions[,]'" "'a formulaic recitation of the elements of a cause of action[,]'" or "'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (third alteration in original) (quoting

*Twombly*, 550 U.S. at 555, 557). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Because Hicks appears pro se, the Court construes his filings "'liberally'" and holds his complaint "'to less stringent standards than formal pleadings drafted by lawyers[.]'" *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). There are limits to liberal construction, however, and "courts are not required to conjure up unpleaded allegations or guess at the nature of an argument." *Brown v. Cracker Barrel Rest.*, 22 F. App'x 577, 578 (6th Cir. 2001) (citing *Wells v. Brown*, 891 F.2d 591, 594 (6th Cir. 1989)).

### III. Analysis

The remaining claims in this action are Hicks's false arrest and malicious prosecution claims against Carr under § 1983 and Tennessee law.

To prevail on a § 1983 claim, a plaintiff must show "(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Shadrick v. Hopkins Cnty., Ky.*, 805 F.3d 724, 736 (6th Cir. 2015) (quoting *Jones v. Muskegon Cnty.*, 625 F.3d 935, 941 (6th Cir. 2010)).

To establish a Fourth Amendment violation resulting from false arrest "requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff." *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010) (quoting *Voyticky v. Vill. of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005)). To prevail on a false-arrest claim under Tennessee law, a "plaintiff must prove '(1) the detention or restraint of one against his will and (2) the unlawfulness of such detention or restraint.'" *Brown v. Christian Bros. Univ.*, 428 S.W.3d 38, 54 (Tenn. Ct. App. 2013) (quoting *Coffee v. Peterbilt of Nashville, Inc.*, 795 S.W.2d 656, 659 (Tenn. 1990)).

To establish a Fourth Amendment violation resulting from malicious prosecution, a plaintiff must establish that (1) "'a criminal prosecution was initiated against [him]'"; (2) the defendants "ma[d]e, influence[d], or participate[d] in the decision to prosecute'"'; (3) "'there was a lack of probable cause for the criminal prosecution'"; (4) "'"as a consequence of a legal proceeding," he suffered a "deprivation of liberty" . . . apart from the initial seizure'"; and (5) "'the criminal proceeding must have been resolved in the plaintiff's favor.'" *Mills v. Barnard*, 869 F.3d 473, 480 (6th Cir. 2017) (quoting *Sykes v. Anderson*, 625 F.3d 294, 308–09 (6th Cir. 2010)). A claim for malicious prosecution under Tennessee law requires a plaintiff to show "that (1) a prior suit or judicial proceeding was instituted without probable cause, (2) defendant brought such prior action with malice, and (3) the prior action was finally terminated in plaintiff's favor." *Roberts v. Fed. Exp. Corp.*, 842 S.W.2d 246, 248 (Tenn. 1992).

A. Carr's Rule 12(b)(6) Motion to Dismiss

There are several reasons why Carr's Rule 12(b)(6) motion to dismiss cannot succeed.

First, under this Court's Local Rules, "[e]very motion requiring a determination of law must be accompanied by a memorandum of law citing supporting authorities . . . ." M.D. Tenn. R. 7.01(a)(2) (motion and supporting memorandum). Carr has not filed a memorandum of law in support of his three-page motion to dismiss. (Doc. No. 114.) The Court may deny his motion on that basis.

Second, a Rule 12(b)(6) motion to dismiss must be "made before pleading if a responsive pleading is allowed." Fed. R. Civ. P. 12(b). "[A] post-answer Rule 12(b)(6) motion is untimely and the cases indicate that some other vehicle, such as a motion for judgment on the pleadings or for summary judgment, must be used to challenge the plaintiff's failure to state a claim for relief at that point." 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* §

1357 (4th ed.) (updated May 20, 2025). Carr filed his answer in response to Hicks's complaint on February 16, 2022. (Doc. No. 28.) Thus, his Rule 12(b)(6) motion is untimely by several years.

Third, district courts routinely construe post-answer Rule 12(b)(6) motions as motions for judgment on the pleadings under Rule 12(c), and the Court may do so here. *See Satkowiak v. Bay Cnty. Sheriff's Dep't*, 47 F. App'x 376, 377 n.1 (6th Cir. 2002) (noting that defendant's "motion to dismiss under Rule 12(b)(6) should be labeled as a Rule 12(c) motion for judgment on the pleadings since the [defendant] had already filed an answer to the complaint"). But converting Carr's Rule 12(b)(6) motion into a Rule 12(c) motion does not result in dismissal of Hicks's claims. In evaluating a motion for judgment on the pleadings, "all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010) (quoting *JPMorgan Chase Bank, N.A. v. Winget,* 510 F.3d 577, 581 (6th Cir.2007)); *see also Murphy v. Dep't of Air Force*, 326 F.R.D. 47, 49 (D.D.C. 2018) (noting distinctions between Rule 12(b)(6) and Rule 12(c) motions and finding that "the Rule 12(c) movant must demonstrate that the law entitles him to win given the undisputed facts that have been alleged in both parties' pleadings"). Carr does not address this legal standard (or the Rule 12(b)(6) legal standard for that matter) and does not address the pleadings in his argument for dismissal. And the argument Carr does make—that the Court should grant his motion to dismiss based on the law of the case doctrine—does not weigh in Carr's favor in the context of a motion for judgment on the pleadings. The Court denied Pearce and Riley's Rule 12(b)(6) motion to dismiss Hicks's malicious prosecution claims under § 1983 and Tennessee law. (Doc. No. 55.)

11
Case 3:21-cv-00837     Document 123     Filed 08/22/25     Page 11 of 17 PageID #: 947

Carr has not shown that he is entitled to relief via a Rule 12(b)(6) motion to dismiss or a Rule 12(c) motion for judgment on the pleadings. For these reasons, the Magistrate Judge will recommend that Carr's motion to dismiss (Doc. No. 114) be denied.

### B. Summary Judgment Independent of Motion Under Rule 56(f)

However, the denial of Carr's motion to dismiss does not render Hicks's remaining claims against him viable for trial. Carr is correct that the Court's prior rulings on other defendants' motions—considered in the context of the case record as a whole—preclude Hicks's success at trial under the law of the case doctrine. Although Carr did not make the right motion to obtain that relief, the Court may address summary judgment independent of any party's motion under Rule 56(f). The Court finds it appropriate to do so here.

Rule 56(f) provides that "the court may" "grant summary judgment for a nonmovant" "[a]fter giving notice and a reasonable time to respond[.]" Fed. R. Civ. P. 56(f)(1). The Sixth Circuit "'looks to the totality of the proceedings below to determine whether the losing party had sufficient notice of the possibility that summary judgment could be granted against it.'" *Smith v. Perkins Bd. of Educ.*, 708 F.3d 821, 829 (6th Cir. 2013) (quoting *Turcar, LLC v. I.R.S.*, 451 F. App'x 509, 513 (6th Cir. 2011)). "'In evaluating this question,'" the Sixth Circuit "'considers whether the prevailing party moved for summary judgment; whether the losing party moved for summary judgment; what issues the parties focused on in their briefs; what factual materials the parties submitted to the court; and whether motions were filed by co-defendants.'" *Id.* "[E]ven when the district court fails to provide adequate notice to the party against whom summary judgment is granted, its judgment will be upheld unless the losing party can demonstrate prejudice." *Id.* (citing *Excel Energy, Inc. v. Cannelton Sales Co.*, 246 F. App'x 953, 960 (6th Cir. 2007)). "After a party receives notice, a reasonable amount of time to respond is presumptively ten days." *Everest Stables, Inc. v. Rambicure*, 803 F. App'x 819, 822 (6th Cir. 2020).

In this case, Hicks had notice of the possibility that the Court would grant summary judgment against him when the Court ordered Carr to file a motion for summary judgment (Doc. No. 113). Further, by addressing summary judgment in the context of a report and recommendation, the Court provides the parties an opportunity to respond within the fourteen-day period provided to file objections. Accordingly, the Court will consider whether summary judgment in Carr's favor is appropriate independent of Carr's motion.

Carr argues that the Court's finding in ruling on Pearce and Riley's motion for summary judgment that "there is 'no genuine issue of material fact that probable cause existed' in this case" mandates judgment in his favor under the law of the case doctrine. (Doc. No. 114, PageID# 919.) Specifically, Carr argues that, "[b]ecause an essential element of Plaintiff's false arrest and malicious prosecution claims is the *lack* of probable cause, and because this Court held that probable cause *exists*, Plaintiff's claims just be dismissed."[1] (*Id.*)

"The doctrine known as 'law of the case' encapsulates a simple idea: courts generally decline to redecide issues that they have already decided." *Samons v. Nat'l Mines Corp.*, 25 F. 4th 455, 463 (6th Cir. 2022) (citing *Messenger v. Anderson*, 225 U.S. 436, 444 (1912)). "'The doctrine precludes a court from reconsideration of issues decided at an early stage of litigation, either explicitly or by necessary inference from the disposition.'" *Vander Boegh v. EnergySolutions, Inc.*, 772 F.3d 1056, 1071 (6th Cir. 2014) (quoting *Westside Mothers v. Olszewski*, 454 F.3d 532, 538 (6th Cir. 2006)). Application of the law of the case doctrine is "'limited to those questions

---

[1] In his response in opposition to Carr's motion, Hicks argues that the Court's prior summary judgment ruling "was motivated by [Hicks's] failure in complying with Local Rule 56.01 when responding to the motions for summary judg[]ment and not on the substantive legal issues." (Doc. No. 121.) While the Magistrate Judge did find that Hicks's responses to the defendants' statements of undisputed material fact were insufficient under Local Rule 56.01, that finding did not materially affect the determination of the legal issues on which the recommendation that summary judgment be granted was based.

13

Case 3:21-cv-00837    Document 123    Filed 08/22/25    Page 13 of 17 PageID #: 949

necessarily decided'" in the earlier proceedings. *Vander Boegh*, 772 F.3d at 1071 (quoting *Hanover Ins. Co. v. Am. Eng'g Co.*, 105 F.3d 306, 312 (6th Cir. 1997)). "[T]he phrase 'necessarily decided' . . . describes all issues that were 'fully briefed and squarely decided' . . . ." *Perkins v. Am. Elec. Power Fuel Supply, Inc.*, 91 F. App'x 370, 374 (6th Cir. 2004) (quoting 1B James Wm. Moore, Moore's Federal Practice ¶ 0.404(1), at 11–5 (2d ed. 1996)). The Court has decided two issues that direct judgment for Carr on Hicks's claims against him.

### 1. State and Federal False Arrest Claims

First, in its order addressing Pearce and Riley's motion to dismiss, the Court found that Hicks's false arrest claims against them under § 1983 and Tennessee law are barred by the applicable one-year statute of limitations. (Doc. No. 55.)

Because § 1983 does not specify a limitations period, courts apply "the state statute of limitations applicable to personal injury actions under the law of the state in which the § 1983 claim arises." *Eidson v. Tenn. Dep't of Child.'s Servs.*, 510 F.3d 631, 634 (6th Cir. 2007). In Tennessee, the applicable limitations period is one year. *Id.* (citing Tenn. Code Ann. § 28-3-104). However, "[t]he date on which the statute of limitations begins to run in a § 1983 action is a question of federal law." *Id.* at 635. Generally, "the limitation period starts to run when the plaintiff knows or has reason to know of the injury which is the basis of his action." *Id.* The Supreme Court has held that the statute of limitations for a false arrest claim under § 1983 begins to run at the time of arrest or, if the arrest is followed by criminal proceedings, "at the time the claimant becomes detained pursuant to legal process." *Wallace v. Kato*, 549 U.S. 384, 397 (2007); *see also id.* at 390 ("'If there is a false arrest claim, damages for that claim cover the time of detention up until issuance of process or arraignment, but not more.'" (citation omitted)).

The Court adopted the Magistrate Judge's finding that "the one-year statute of limitations began to run on Hicks's § 1983 false arrest claims began to run no later than July 15, 2019"—the

date on which Hicks appeared for a preliminary hearing—and "expired on July 15, 2020." (Doc. No. 53, PageID# 339 (citing *Wallace*, 549 U.S. at 397).) Hicks's false arrest claims against Carr arise out of the same criminal charges and preliminary hearing. Accordingly, the statute of limitations for those claims also began to run no later than July 15, 2019, and had expired when Hicks filed his complaint on November 4, 2021.

### 2. State and Federal Malicious Prosecution Claims

In granting summary judgment to Pearce and Riley on Hicks's malicious prosecution claims under § 1983 and Tennessee law, the Court adopted the Magistrate Judge's determination that, "[b]ecause the Court finds no question of fact in the summary judgment record that there was probable cause to support Hicks's prosecution absent any consideration of [Pearce and Riley's] alleged false statements and testimony, there is no dispute that the Officers' conduct did not violate Hicks's constitutional rights" for purposes of a claim under § 1983. (Doc. Nos. 109, 111.) The Court also adopted the Magistrate Judge's finding that the probable cause determination under federal law also disposed of Hicks's state-law malicious prosecution claim. (*Id.*)

The Court's finding applies with equal force to Hicks's malicious prosecution claims against Carr. The summary judgment record shows that Carr's role in Hicks's prosecution to be supervising Riley's preparation of an affidavit in support of a criminal complaint. (Doc. Nos. 90, 92.) Riley's affidavit is central to Hicks's malicious prosecution claims because Riley stated that officers "spoke with several witnesses" who described the mailbox tampering suspect to be someone who looked like Hicks. (Doc. No. 90-3.) In fact, the officers had spoken only with Absher. Riley stated at summary judgment that he was "not sure why [he] used the plural" to describe more than one witness who had identified Hicks and that he "had the impression" that other neighborhood residents had observed the mailbox tampering and provided descriptions. (Doc. No. 90.)

There is no evidence in the summary judgment record describing the nature or effect of Carr's supervision of Riley's drafting. Carr did not testify at Hicks's preliminary hearing. However, as the Court has already found, "there is no dispute that Riley's affidavit statements went no further than the swearing out of the complaint." (Doc. No. 109.) Thus, "[t]he intervening event of the preliminary hearing . . . effectively nullifies any false statement Riley may have included in his affidavit for purposes of a malicious prosecution claim." (*Id.*) Because Hicks's malicious prosecution claim against Carr is based on his role in the drafting of Riley's affidavit, the Court's prior determination that "there was probable cause to support Hicks's prosecution absent any consideration of [Riley's affidavit]" is equally applicable to Hicks's claims against Carr. (*Id.*) For that reason, there is no dispute that Carr's conduct did not violate Hicks's constitutional rights, and Carr is entitled to judgment as a matter of law on Hicks's § 1983 claim. (Doc. No. 109.) The determination of Hicks's malicious prosecution claim under federal law dictates the same disposition of his Tennessee-law malicious prosecution claim. *See Weser v. Goodson*, 965 F.3d 507, 517 (6th Cir. 2020) (finding that probable cause determination of § 1983 malicious prosecution claim "disposes of [the] state-law malicious[ ] prosecution claim"). Accordingly, summary judgment on the Tennessee-law malicious prosecution claim is also appropriate.

## IV.     Recommendation

For these reasons, the Magistrate Judge RECOMMENDS that the Court DENY Carr's motion to dismiss Hicks's claims against him under Rule 12(b)(6) (Doc. No. 114) and GRANT summary judgment to Carr independent of a motion under Rule 56(f).

Any party has fourteen days after being served with this Report and Recommendation to file specific written objections. Failure to file specific objections within fourteen days of receipt of this report and recommendation can constitute a waiver of appeal of the matters decided.

*Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004). A party who opposes any objections that are filed may file a response within fourteen days after being served with the objections. Fed. R. Civ. P. 72(b)(2).

Entered this 22nd day of August, 2022.

_____
ALISTAIR E. NEWBERN
United States Magistrate Judge